rtas. Thank you. Can we make sure that Judge Winter is still online? Are you able to? Super. Good morning. Good morning, Your Honors. May it please the Court. Jennifer Mellon from the Federal Public Defender's Office on behalf of Brandon Hu rtas, the appellant in this case. I'll start with the question of whether Mr. Hu rtas submitted, since that is the crux of the District Court's decision below denying his motion to suppress. This case raises what I think is an interesting question about how to distinguish between a brief but authentic submission and what the Court below called a temporary halting that does not rise to the level of a submission and thus does not violate the Fourth Amendment. It's clearly possible to submit authentically but then later to flee and thus end that submission, and I've cited to several cases in my brief in which courts of appeals have held that that happened. In this case, there was submission, even though it was brief and later did end. Mr. Hu rtas submitted to the officers' attempt to detain him really in the only way he could, which was by remaining fixed and answering the officers' questions. Did he answer the questions? He did. And that's what the— Twice in moments, this whole interaction. Yes. So what the officer testified to below is that the interaction lasted anywhere between 30 and 60 seconds, but that's clearly enough time for multiple questions to have been posed. If he put his hands on the roof of the car, even if it was for 10 seconds, he would have submitted. This case is different. The officer in this case— Wait for the cop to get out of the car. The cop is on foot. Step on the gas and go. That's not submission because that is simply waiting to see whether you can—it's a way to maximize your chances of getting away. That's not submission. That case, Your Honor, is United States v. Swindle? Yes. Yes. Which I do believe is distinguishable from what happened here. How? Because in this case, there was much more extensive interaction between Mr. Hu rtas and the officer than in United States v. Swindle. In that case, the car pulled over briefly and then took off. But isn't there communication from a police car to a driver when the lights are flashing? It tells you to pull over. That is a communication. We all follow it. I think it's more akin to the kind of communication that's happened in these other cases such as United States v. Valentine and United States v. Hernandez that is distinguishable from what happened here. It's more of a pause for a few moments than an actual stopping and responding to the officer's questions, which are— The car, of course, stops. That's why the cop got out of the car because the car he was chasing came to a halt. But more briefly than what happened here, even though the time itself is not, according to United States v. Swindle, the crux of the question necessarily because even in Swindle— It can't be the crux of the question because we're looking at 30 seconds or a minute, but actually if there was submission within 10 seconds, there would be submission if it was authentic. So the time is not really all that important. I mean, I think these are the considerations that Judge Argerton considered and weighed. Is this a matter of law or is this an issue or is there an element of fact about this? There's no fact dispute of any kind. It's interesting because there were factual disputes on the record below that were not resolved as part of the court's decision in the case. Specifically on the question, for example, of whether Mr. Huertas was already in a fixed position when approached by the police officer or whether he was walking and then stopped. And what essentially the district court said below was that even assuming that he had stopped walking in response to the approach of the police officer, the court would still have found that it was a temporary halting. Is there any dispute here that there was a show of force? No, Your Honor. No. Our argument is specifically that there was a show of authority and submission, not that there was any use of— That's correct. That's correct, and not that there was any use of violent force. But in any event, you argue that the verbal exchange is the sine qua non of submission. The remaining fixed, and I specifically argue that also in the context of everything else that happened as part of that approach. The cases talk about these inquiries as being very fact-specific and very contextual, and the submission, I think, looks more like a submission in the context of the show of authority that preceded it. It's late at night. Mr. Huertas—it's after dark. Mr. Huertas is alone in a desolate area in Bridgeport. And importantly, the officer approaches him coming the wrong way down a one-way street. At the same time, the officer is using a spotlight in order to light him up and is also asking him what I would describe as accusatory questions out of the window of the car. In response to all of that, Mr. Huertas stays fixed and responds to those questions. That 30 to 60-second period during which he's responding to those questions is distinguishable from the cases that are cited by the district court. Specifically in Valentine, the defendant in that case is described as pausing for a few moments and only giving his name. Clearly more than that happened here. In Hernandez, the defendant is described as hesitating for a moment and making direct eye contact, but there's no description of any further exchange. So— Can I ask you a hypothetical? If the defendant did not run away but just stayed there fixed and the police officer got out of the car, would the police officer have had a right to search the bag based on these facts? At this point, Your Honor, no. And that was the second part of our argument at the district court level, was that there was no reasonable suspicion for a stop and a search at that time, at the time of the initial encounter. The district court didn't get to that question— There wasn't even enough for a terrorist stop in your mind just because that woman said there's a man there with a gun? No, Your Honor. It was an anonymous tip. The officer was unable to identify the person who made that allegation, and there were really no specific factors besides the fact that the person with the gun was somewhere in the area that would have narrowed appropriately the officer's suspicion to Mr. Huertas. Well, wouldn't Mr. Huertas, like anybody else in the neighborhood, be happy to have the police in the area if someone was running around with a gun? Everyone's interested in public safety, Your Honor. Yes, that's my point. But I think Mr. Huertas, like other people in the neighborhood, would also value his right to be free from unreasonable searches and seizures. You're saying he was seized? Yes, at the time of the initial encounter. That's why—and that, in fact, there was a submission, which is the basis of our request that the case be remanded. The issue is whether there was an authentic submission. That's correct, Your Honor. Well, you've reserved rebuttal. Thank you. We will hear you then. May it please the Court, good morning. Assistant United States Attorney Alina Reynolds from the District of Connecticut. And let me start by saying that this police officer acted exactly how one would want a police officer to act. He did exactly what he should do in the face of a complaint of someone with a gun. He acted reasonably from the moment he got that complaint in getting information. And this wasn't an anonymous complaint. There's a scale, and as we point out in footnote 5 of our brief, where we do address an alternative finding that this person— Well, he didn't know who the woman was. He didn't know who she was, but he spoke to her in person. This wasn't a phone call. He was able to observe her demeanor. He was able to see that she was nervous, and he testified to that at the suppression hearing. He was able to run her plate. He called in the information, and she gave very specific information. It wasn't just a man with a gun. She said, there's a man named Brendan. He went that way. She pointed out the direction he had walked. She said he was walking. She said specifically that he had a gun in a black bag. And so moments later, after calling this information to his command, the officer, who was working alone that night in a marked car in uniform, proceeded down the street, and he shone the spotlight down one of the streets around the Bridgeport Police Department, because this all happened right in the vicinity of the Bridgeport Police Department. And he saw a man, as he described it, holding a black bag in a strange way, is what he said, almost like a lantern, and he pointed that out kind of in front of him. And that's when he approached. And he approached. When the officer searched the plates, going back just a minute, it didn't yield a female name. That's correct, Your Honor. The information he got, and he didn't get that information, I believe, until the foot pursuit had begun, but it did come back that the car was registered to a man, not a woman. But he, at that point, had reasonable suspicion. But the district court below decided this case on a different factor, and properly so, because under the cases, under the Supreme Court cases, under Chesternaught, under Mendenhall, and this Court's findings and decision in the Swindle case, it's very clear that there was no show of authority, and there was no actual submission. What's important here is not just how the officer ---- Is that a finding that Judge Arderton made? Her finding was that there was no actual submission. Yes. That's my understanding, and that's the issue. I mean, it would be a separate question as to whether there was a show of authority. I think it's close because, you know, the car is going the wrong way down the street. It's a police car. It's a marked car. It's got a spotlight shining on you and nobody else. And people might reasonably think that they have to ---- that if they ran away, they would be pursued. So, I mean, it's demonstrating that this is the cops and we're here. And so that's arguably a show of authority. And, indeed, there may even have been some submission. The question is, was it authentic? And what's the principle that we ought to use to separate authentic submissions from false submissions? I think what the cases have said, Your Honor, and when I mentioned show of authority, I think you have to look at the totality of the circumstances, which is what Judge Arderton did in this case. And so you can't look at one fact in isolation, and that's what the cases have said. Is oral review de novo? With regard to the question of law, yes, Your Honor. Even though it's all ---- we have to consider all the circumstances. Correct, Your Honor. And found that he did not submit to the officer's authority, the district court never reached the question of whether a reasonable person in Ms. De Huerta's place would have felt free to leave. She didn't reach that at all. It doesn't come from her line of reasoning. Correct, Your Honor. But what we're arguing is just in looking at the whole picture, it's important to look at how the officer acted. Did he act reasonably? And what are the things he didn't do under the analysis of the show of authority? He didn't activate lights and sirens. He didn't drive down that road at a high rate of speed. He didn't block the defendant in any way. He didn't even get out of his car. He didn't issue any verbal commands. He spoke to Mr. Huerta in a respectful tone, asked an ordinary question. Your point is that he did not authentically submit because while he stopped, he was hoping the car would go away and pass on, but as soon as the cop opened the door, he ran away, and that indicated that he was simply waiting for the cop to leave, and if the cop was going to impose any form of authority or restraint on him, he was going to flee. He took that moment, that opportunity to stop so that the officer then, while he was getting out of his car, about to get out of his car, that's when Mr. Huerta fled. So what our position is that the judge considered all of this. She heard the testimony. She considered all the facts. The record is very full and complete in this regard, and she properly found under the cases of this circuit and under the Supreme Court cases that this wasn't an actual submission, but we've also laid out in footnote five of our brief, and as we argued below and as the defense argued below, there was reasonable suspicion in this case. This wasn't a fully anonymous complaint. The officer acted reasonably. He had every right to go up to Mr. Huerta, who was holding a black bag, which matched the information he had gotten, and ask him a few questions, and so at that point when he fled under the reasonable suspicion, this court could also alternatively uphold the district court's decision. If you were holding a gun in a bag, you might want to hold it up so that it doesn't by accident hit something and go off. Correct, and that's how the officer testified. Mr. Huerta was holding that black bag that night. So unless there are any further questions, Your Honor, we would rest on our submission. Thank you. Thank you. I hear no question from Judge Winter. Okay. Rebecca. Yes, Your Honor. To address the question of what constitutes authentic submission, remaining in a fixed position can be authentic. It's one of the types of submission that the Supreme Court specifically referred to in Brennan v. California. In that case, the court said that it's important to look at the totality of the circumstances to understand what it would mean to submit to a show of authority, and specifically stated that one sitting in a chair may submit to authority by not getting up to run away. Let me give you a hypothetical. A policeman walks up to somebody to talk to that person, but there's a fence in between the two of them. The person talks to the police officer, and as soon as the police officer says, stay there, I'm coming around to get you, the person runs. So the cop has to jump over the fence in order to get you. Is that authentic, or is that simply designed to pacify the officer, hope that the cop goes away? I think it would depend on the other circumstances that preceded that interaction. If it began with the officer demanding that the person stop from a distance and the person stood there and waited for an extended period of time. If there's a fence in between them, you can look through, but you can't get there, you can't lay hands upon anybody, you can't handcuff them, you can't search them, you can't do anything. It's like being on the phone, isn't it? I do think it would depend on how long the person stood there waiting for the officer in the first place. And suppose it was under a minute. And other circumstances that accompanied that demand to stop. In this case, Mr. Huertas did wait. He did answer accusatory questions. I think it was clear from the moment that the officer started driving towards him the wrong way, down a one-way street, that he was interested in detaining him. In fact, the officer said that in his police report. So there was an intent to detain from early in this process. And Mr. Huertas did stand, remain fixed, and respond to questions, even once that intent to detain was apparent, which was much earlier. Is it not the case that answering those questions could be seen as in aid of escaping? That is to say, if he immediately ran away, the cop would run after him. Well, he might fear that. Whereas if he answered questions and seemed relaxed and bored, the officer, the guy might have driven on. The question is whether what your client did could reasonably be seen as in aid of an ultimate, even immediate plan to escape, to run away. I think it could as easily be seen as the opposite of that. He may have had a better chance of escape if he took off immediately without answering the questions. And in fact, he was chased in the end anyway. Thank you. Thank you. Judge Winter, are there any questions? No, I'm done. Thank you. Okay. Thank you. Thank you both. We'll reserve decision and at this time . . .